21-mj-6454-MPK
21-mj-6455-MPK

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Amie Le, being duly sworn, state the following:

## Introduction

### Introduction and Agent Background

1. I am currently a deputized Task Force Officer with the United States Drug Enforcement Administration ("DEA"), assigned to the DEA-New England Field Division's Tactical Diversion Squad ("TDS") in Boston, Massachusetts. Investigators assigned to TDS primarily investigate the illegal diversion of pharmaceuticals. As a Task Force Officer with the DEA, I am an "investigative or law enforcement officer of the United States," within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a deputy sheriff since 2012 and have served as a TFO since 2020.

2. During my career with the DEA, I have had extensive experience in the investigation of the activities of drug traffickers. I have been involved in over 30 arrests, most of which were for narcotic-related violations. I have participated in the execution of over 20 search warrants resulting in arrests and seizures of illegal substances and all types of evidence. I have participated in multiple drug investigations, both in leadership and subsidiary roles. I have debriefed defendants, informants, and witnesses with personal knowledge about drug trafficking activities, and the operation of drug trafficking organizations. I personally have participated in almost all aspects of drug trafficking investigations, including, but not limited to, conducting surveillance, acting in undercover capacities, using confidential informants and conducting court-ordered wire and electronic surveillance. I have served as both a surveillance agent and a monitoring agent on Federal wiretap investigation.

3. In addition, in the course of my employment, I have attended many law enforcement schools and received specialized training regarding the activities of drug traffickers, including the methods used by drug traffickers to conceal and launder the proceeds of their drug trafficking activities. These schools include U.S. Drug Enforcement Administration's Basic Drug Investigator School; Basic Undercover Techniques; and the Basic Reserve Intermittent Program.

4. Based on my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage and transportation of drugs, and the collection of money that constitutes the proceeds of drug trafficking activities. I am also familiar with the common appearance, packaging, and texture of various narcotics and other drugs. Moreover, I am familiar with the manner in which drug traffickers use vehicles, common carriers, main and private delivery services, and a variety of other means to transport and distribute drugs and the proceeds of drug trafficking. I am also familiar with the way drug traffickers use telephones, and other communication devices to facilitate their illegal activities. I know that drug traffickers sometimes use firearms to protect their drugs and drug proceeds and that drug traffickers will often engage in other illicit activity, including, but not limited to, the sale of firearms as part of their drug trafficking activities. I have participated in undercover and controlled purchases of weapons, including those from drug dealers.

5. Based upon my training and experience, I am further aware that drug traffickers commonly use multiple cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones to thwart law enforcement's use of electronic surveillance. I am familiar with the way narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, electronic text-messages, coded text messages, and other means of communication to facilitate their illegal activities. I am

familiar with the vernacular, i.e., the "street" language, used by drug traffickers, as well as the methods they use to disguise conversations and operations. In addition, many drug trafficking and money laundering networks often utilize email, including draft email messages, and instant messaging, including encrypted communication applications such as WhatsApp and video chat services such as "Skype" communications.

6. Based upon my training and experience, I known that drugs are generally stored and dispersed at varied, and highly secret, locations to avoid seizure and theft. Payment for drugs usually occurs at quickly arranged meetings and at various locations separate from those used to store the drugs. Telephonic and/or online contact is therefore required to coordinate and conduct the ongoing illegal drug transaction.

7. Based on my training and experience, I am familiar with narcotics traffickers 'methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

**Purpose of Affidavit**

8. I submit this affidavit in support of an application for (1) a criminal complaint charging JORGE a/k/a "GEORGE" GEREZ ("GEREZ") with violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to commit drug trafficking offenses); and 21 U.S.C. § 843(b)(3) (the

use of a communication facility in the commission of drug-trafficking offenses) (the "SUBJECT OFFENSES") and (2) a search warrant under Federal Rule of Criminal Procedure 41 for the residence located at 4 Lucy Street, #544, Dorchester, MA 02125 (hereinafter, the "SUBJECT LOCATION"), more particularly described in Attachment A, because I believe there is probable cause to believe GEREZ committed the SUBJECT OFFENSES and that the SUBJECT LOCATION contains evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, more particularly described in Attachment B.  As this affidavit is submitted for the limited purpose of obtaining the criminal complaint, the arrest warrant, and the search warrant for the SUBJECT LOCATION, I have not included all facts known to me but only those necessary to support this application.

9. The facts in this affidavit come from my personal observations in the matter, my training and experience, and information obtained from other agents and witnesses.

## Probable Cause

10. In May of 2021, CS-1[1] placed a recorded call to GEREZ. CS asked GEREZ if GEREZ could obtain a sample of cocaine. GEREZ replied that he could.

11. During a recorded conversation on which took place on or about May 8, 2021, , GEREZ told CS-1 about the method that GEREZ utilized to move illicit drugs. I have reviewed this recording. In this call, GEREZ stated that he is currently in a position where he does not need to physically handle the incoming drugs that are coming from overseas nor does he want to

---

[1] I am aware that CS has an extensive criminal history, including convictions for transportation of a controlled substance; possession of a controlled substance for sale; possession of a controlled substance for sale while armed; use of a false compartment to conceal a controlled substance and; receiving stolen property while on bail. CS is currently cooperating with law enforcement in the hopes of receiving consideration for potential federal charges relating to drug trafficking and possession.

take the risks to store the drugs anymore, ("I just have you know, shit comes from Puerto Rico. I have someone grabs it and gives it to the other person. I don't have to even see it, touch it, or store it here"). Based on my knowledge and training, I believe GEREZ is saying that he has arranged for someone else who will receive the drug packages and will deliver it to the next person in the chain for distribution. By using this method, GEREZ is able to eliminate the step where the drugs are physically in his possession which eliminates the risk of being caught with illicit drugs by law enforcement. GEREZ also said that he would keep his supply in Puerto Rico and sell a kilogram for at least $12,000. GEREZ told CS-1 that he can introduce his connections from Puerto Rico to CS-1 if CS-1 wanted to get product directly from them.

12. GEREZ then discussed his drug connections from overseas. GEREZ stated that "his boys" are trying to purchase some stuff, specifically cocaine, from Columbia. GEREZ said that the price for a "brick" (kilogram) of cocaine in Columbia is $5,000 but will cost roughly $38,000 to $42,000.

13. On June 22, 2021 CS-1 arranged to purchase one pound of methamphetamine from GEREZ for $4200. On June 23, 2021, CS-1 was told by GEREX to meet an unknown female in the area of 39 Main Street Somerville, MA.  Surveillance units were established in the area at approximately 11:50 a.m.   At approximately 12:04 p.m. CS-1 and your affiant, who was in an undercover capacity, arrived in the area of 39 Main Street, Somerville, MA.

14. At approximately 12:41 p.m., GEREZ called CS-1 and told CS-1 that the meet location was going to be moved to the area of 95 Vine Street, Saugus, MA.  Investigators re-established surveillance in this area.  At approximately 1:20 p.m.,  CS-1 and your affiant arrived in the area.

15. At approximately 1:35 p.m., an unknown Hispanic female was observed by other law enforcement officers approaching the undercover vehicle. Upon entering the vehicle, the Hispanic female was on speaker phone with an unidentified male. Your affiant then drove down Vine Street while the Hispanic female handed CS-1 a clear plastic wrapped package containing a white substance. CS-1 immediately took the package and placed it between the passenger seats. After this transaction took place, your affiant stopped the vehicle at the intersection of Vine Street and Marr Road to allow the Hispanic female to exit the vehicle, CS-1 then took the plastic-wrapped package from the seat and placed it in the middle of the driver and passenger seat so it was visible to your affiant. [2]

16. Officers conducting surveillance then responded to the area of 4 Lucy Street, Dorchester, MA. where CS-1 and your affiant were arranging to pay GEREZ for the methamphetamine. CS-1 had previously been at the residence to meet GEREZ and knew that the apartment was #544.

17. Surveillance was established in the area of 4 Lucy Street, Dorchester, MA At approximately 3:05 p.m., CS-1 and your affiant arrived in the area, entered the underground garage and then drove to the fifth floor of 4 Lucy Street, Dorchester, MA. After parking, your affiant observed CS-1 enter into the building of 4 Lucy Street through the garage entrance.

18. Prior to the entry into the SUBJECT LOCATION, CS-1 was provided with video and audio recording equipment.

19. Attachment A includes a a still photo from the video camera that CS-1 wore. It shows the front door of #544. The number of the unit is on the side of the door. CS-1 entered

---

[2] Although the final drug analysis has not been completed, a TruNarc field test on the drugs which were purchased tested positive for the methamphetamine.

through this door into the SUBJECT LOCATION and met with GEREZ. As CS-1 entered the SUBJECT LOCATION, investigators were able to obtain and review video footage of the money payment from CS-1 to GEREZ for the purchase of one pound of methamphetamine. During the transaction, GEREZ informed CS-1 that there was an incoming package of 10-15 pounds of methamphetamine scheduled for next week.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

20. Through my training, experience, debriefings with drug traffickers, and consultation with other special agents and law enforcement officers, I have learned that:

21. Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence and locations associated with them, including stash houses. Specifically, individuals involved in drug trafficking often maintain ledgers in order to keep track of the purchasing, storage, distribution, and transportation of drugs and/or the laundering of the proceeds of their drug sales. Even after the drugs are sold and/or used, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions and to maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators. In my experience, premises used by drug traffickers (including stash houses) often contain documents and articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

22. Individuals involved in drug trafficking must often rely on others to obtain their drugs and/or the materials necessary to manufacture/distribute their drugs. Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at premises associated with them and will maintain these types of materials even after drugs are sold or used.

23. Individuals involved in drug trafficking often store articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

24. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at premises associated with them even after drugs are sold or used. Therefore, I am requesting permission to search for and to seize photographs that law enforcement agents determine to be of evidentiary value.

25. Individuals involved in drug trafficking use various tools, instruments, materials and other paraphernalia to facilitate their trafficking, including weighing the drugs and packaging the drugs. These types of materials include, but are not limited to, scales, cutting materials, and packaging materials. These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used. I am also aware that it is generally a common practice for traffickers to conceal large sums of money at their residences, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences, even after drugs are sold or used.

26. Individuals involved in drug trafficking keep weapons, including firearms, at the locations where they store their drug supplies in order to protect both themselves and their drugs from thefts and/or robberies.

27. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

28. From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or to be used at a business, such as e-mail, word-processing documents, photographs, and spreadsheets.

29. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

30. Based on my training and experience, I know that individuals typically possess in their residences documents and other items that reflect their occupancy and control of the premises, such as personal mail, checkbooks, identification, notes, correspondence, leases, utility bills, rent receipts, financial documents, keys, and photographs.

## CONCLUSION

31. Based upon my training and experience, consultation with other agents and law enforcement officers and my personal observations of events in this investigation, I believe there is probable cause to believe that GEREZ has committed the SUBJECT OFFENSES.

32. I also believe there is probable cause to believe that property that constitutes evidence of the commission of the above referenced offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing the SUBJECT OFFENSES, will be found at the SUBJECT LOCATION.

I declare that the foregoing is true and correct.

/s/ Amie Le
_____
AMIE LE
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to me telephonically in accordance with Fed. R. Crim. P. 4.1 this __29th__ day of June, 2021.

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS